## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11** |
| **NEAR INTELLIGENCE, INC.**, *et al.*, | **Case No. 23-11962 (TMH)** |
| Debtors.[1] | **(Jointly Administered)** |
| **DRIVETRAIN, LLC, as Plan Administrator and Litigation Trustee of the Near Intelligence, Inc.** *et al.* **Litigation Trust,** | **Adversary Proceeding No. 25-_____** |
| Plaintiff, | |
| v. | |
| **UHY LLP,** | |
| Defendant. | |

## COMPLAINT

Drivetrain, LLC, as Plan Administrator and Litigation Trustee (the "Trustee") of the Near

Intelligence, Inc., *et al.* Litigation Trust (the "Litigation Trust"), appointed in the above-captioned

chapter 11 cases of Near Intelligence, Inc. and its co-debtors (collectively, the "Debtors"), hereby

brings this adversary proceeding against Defendant UHY LLP ("UHY"), and alleges as follows:

## NATURE OF THE ACTION

1.    This action arises from an auditor's misrepresentations that inflicted more than

$400 million in losses and busted a SPAC.  More specifically, UHY negligently misrepresented

the financial condition of its client, Near Intelligence Holdings, Inc. ("Near Holdco"), to a special

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (9004), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd.  The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, California 91124.

purpose acquisition company, KludeIn I Acquisition Corp. (the "SPAC" or "KludeIn"), and the SPAC's reliance on UHY's misrepresentations caused it to collapse into bankruptcy.

2.      As a public accounting firm, UHY had a duty to, *inter alia*, exercise and maintain professional skepticism, exercise due professional care, perform its audits to obtain reasonable assurance that its client's financial statements were free of material misstatement, and exercise the skill and care normally possessed by members of its profession.  It likewise had a duty to not make negligent misrepresentations to those it knew were relying on its audit work.  In spite of these duties, UHY's audits of Near Holdco consistently failed to identify a multi-year round-tripping scheme between Near Holdco and its largest customer.  As a result, the financial statements that UHY blessed materially misstated Near Holdco's revenue and overall financial condition, and UHY's unqualified audit opinions constituted material misrepresentations that the SPAC relied on, causing it nine-figure losses and its ultimate demise.

3.      As reflected in its internal records, UHY knew that it had been hired in connection with Near Holdco's acquisition by the SPAC in a transaction referred to as a "de-SPAC."  Those records also reflect that UHY understood that it was hired to (a) audit Near Holdco's historical financial statements under Public Company Accounting Oversight Board ("PCAOB") standards, (b) certify that those financial statements conformed with generally accepted accounting principles ("GAAP"), and (c) provide that proof to the SPAC, which UHY understood would incorporate UHY's work into its securities filings.  UHY thus knew that its audit opinions would be received and relied on by the SPAC in connection with consummating the de-SPAC transaction.  Accordingly, UHY also knew that any misrepresentations it made in its audit work could cause the SPAC devastating harm.

4.     UHY issued several unqualified audit opinions to Near Holdco, and the SPAC relied on those opinions in deciding to consummate the de-SPAC transaction and incorporated those opinions and audited financial statements into its own public securities filings.  However, as noted above, UHY's audits missed multiple red flags indicating that, for years, Near Holdco had been engaged in a "round-tripping" scheme with its largest customer, MobileFuse LLC ("MobileFuse").  UHY's failures breached its professional standard of care and caused it to make material misrepresentations to the SPAC.  The SPAC's reliance on those misrepresentations caused it to incur more than $400 million in damages and collapse into bankruptcy less than a year later.

### PARTIES

5.     On December 8, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition for relief in this Court under title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases.  These cases were jointly administered for procedural purposes.  They were not substantively consolidated.  On March 13, 2024, the Debtors filed the *Modified Third Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Near Intelligence, Inc. and Its Affiliated Debtors* [D.I. 336] (the "Plan"). On March 15, 2024, the Court confirmed the Plan, as supplemented by filings on February 27, 2024, March 11, 2024, and March 13, 2024 [D.I. 305, 328, 337], in its *Findings of Fact, Conclusions of Law, and Order Approving Adequacy of Disclosures on a Final Basis and Confirming the Modified Third Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Near Intelligence, Inc. and Its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 346] (the "Confirmation Order").  The Confirmation Order appointed the Trustee as the representative the Debtors' estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and vested in the Trustee the authority to "investigate[] and, if appropriate,

pursu[e]" certain causes of action, including causes of action that previously belonged to the Debtors. This adversary proceeding prosecutes certain causes of action that belonged to the SPAC before the Petition Date and vested in the Litigation Trust pursuant to the Confirmation Order.

6.     The SPAC was a Delaware corporation that was formerly registered with the United States Securities and Exchange Commission as a publicly traded company on the NASDAQ and, at all relevant times, maintained its principal (and only) place of business in California.

7.     Defendant UHY is a professional limited liability partnership formed under New York law. UHY is licensed to practice public accounting and provide attest services in California and other jurisdictions, including New York. Its registered agent for service of process is National Registered Agents, Inc., 28 Liberty Street, New York, New York 10005. UHY has maintained an office in California since 2016.

## JURISDICTION AND VENUE

8.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, because it arises under the Bankruptcy Code and is related to the above-captioned bankruptcy cases.

9.     UHY has a scheduled nonpriority claim in the amount of $138,625.00 in these bankruptcy cases (the "Scheduled Claim"). Pursuant to Federal Rule of Bankruptcy Procedure 3007(b), this adversary proceeding includes—and forms the basis for—the Trustee's objection to UHY's Scheduled Claim. Additionally, this adversary proceeding includes claims by the Trustee under chapter 5 of the Bankruptcy Code to avoid and recover a preferential transfer made to UHY. This is therefore a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 7008-1, the Trustee consents to the entry of final orders and judgment by the Court.

10.     The Court has personal jurisdiction over UHY pursuant to Federal Rule of Bankruptcy Procedure 7004(d) because the exercise of jurisdiction is consistent with the Constitution and the laws of the United States.

11.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

**A.     The SPAC's Identification of Old Near as an Acquisition Target**

12.     The SPAC was originally incorporated in 2020 as a special purpose acquisition company.  The SPAC had no business operations of its own and was formed principally to effectuate a merger, share exchange, asset acquisition, or other similar business combination with one or more businesses.  The SPAC completed its initial public offering ("IPO") and became a NASDAQ-traded company, ticker INKA, on January 11, 2021.  The SPAC raised a total of $172,500,000 in the IPO.  The SPAC's principal executive office was located in Berkeley, California, as noted in its securities filings.

13.     After its IPO, the SPAC searched for a company with which to pursue a business combination.  The SPAC contacted and was contacted by numerous companies, advisors, and other persons with respect to potential transactions.  The SPAC's securities filings confirmed that its search focused on growth-oriented targets operating in the technology and/or software industry.  Ultimately, the SPAC chose to pursue a business combination with Near Pte. Ltd. ("Old Near").

14.     Old Near was a Singapore corporation, based in Singapore, that provided software-as-a-service solutions and specialized in data intelligence.  Old Near's operations included those of its subsidiaries in the United States, Singapore, India, Australia, and France.  Old Near's primary source of revenue was to sell subscriptions to its proprietary data platform, which Old Near claimed would enable customers to derive actionable intelligence of consumer behavior to help those customers make meaningful marketing and operational decisions.

15.     The SPAC's securities filings disclose that, in selecting Old Near as its acquisition target, the SPAC's board considered as material Old Near's purported growth potential, existing customer base, annual recurring revenue, financial condition, and other factors.  As explained below, the SPAC's understanding of, and public disclosures relating to, these important financial metrics were heavily influenced by UHY.

**B.     The Round-Tripping Scheme at Old Near**

16.     When selecting Old Near as its acquisition target, the SPAC was completely unaware that a major driver of Old Near's purported growth potential and annual recurring revenue was a round-tripping scheme between Old Near and its largest customer, MobileFuse.  Indeed, the SPAC had no affiliation to Old Near or Near Holdco until March 23, 2023, and did not discover the round-tripping scheme until October 2023.

17.     The scheme between Old Near and MobileFuse began in 2021 and was perpetrated through the use of sham invoices issued by MobileFuse to Old Near and actual invoices issued by Old Near back to MobileFuse.  Old Near would send money to MobileFuse to pay a sham MobileFuse invoice, and MobileFuse—often on that same day—would transfer that money back to Old Near to pay an actual Old Near invoice.  That is, Old Near was sending MobileFuse the money that MobileFuse then used to pay Old Near invoices.  Because MobileFuse had not earned that money through goods or services, the round-tripping lacked economic substance, but gave the false appearance of recurring revenues to each party.  Old Near in fact was merely underwriting MobileFuse's accounts payable, to Old Near's own detriment.

18.     Underlying this scheme was the fact that Old Near's management—*i.e.*, its CEO (Anil Mathews), CFO (Rahul Agarwal), and President (Shobhit Shukla)—owned stakes in MobileFuse through personal investment vehicles.  The CEO's vehicle (Cecil Capital Pte. Ltd.),

the CFO's vehicle (Oriental Investment Advisors Pte. Ltd.), and the President's vehicle (Godspeed Investments Pte. Ltd.) were the sole shareholders of Uniqequity Limited, which owned 100% of Uniqequity Pte. Ltd. ("Uniqequity"). Uniqequity, in turn, owned approximately 10% of MobileFuse beginning in January 2021, before the round-tripping began. The scheme thus benefitted Old Near's management but cost Old Near millions of dollars in cash and poisoned its future prospects.

**C.    The SPAC's Acquisition of Old Near**

19.    The SPAC did not know anything about Old Near's round-tripping scheme when it began its pursuit of Old Near in earnest in the summer of 2021. As negotiations between the SPAC and Old Near grew more serious, Old Near in February 2022 decided that it would reorganize as a Delaware corporation based in California. That reorganization was accomplished by Old Near's creating a Delaware subsidiary, Near Holdco, and contributing to Near Holdco legal title and beneficial ownership of substantially all of Old Near's assets and all of Old Near's liabilities in exchange for the voting stock of Near Holdco. Near Holdco, in turn, established its headquarters in Pasadena, California.

20.    In May 2022, the SPAC and Near Holdco entered into a definitive agreement and plan of merger that would make Near Holdco a wholly owned subsidiary of the SPAC. The merger took place in two steps. First, Near Holdco merged into the SPAC's wholly owned subsidiary corporation ("Merger Sub 1"), with Near Holdco as the surviving entity. Second, Near Holdco merged into the SPAC's other wholly owned subsidiary—a Delaware limited liability company— and that Delaware LLC ("Merger Sub 2") was the surviving entity. Near Holdco ceased to exist. The SPAC then renamed itself "Near Intelligence, Inc.," and Merger Sub 2 changed its name to "Near Intelligence, LLC." This series of transactions closed on March 23, 2023.

21.     As consideration for the merger, the SPAC transferred shares of its Class A common stock to the holders of Near Holdco stock at a conversion ratio of approximately 107.66. This resulted in the SPAC's awarding those former holders more than 41 million shares for a total market price of more than $400 million.

**D.      UHY's Crucial Role in the SPAC's Acquisition of Near Holdco**

22.     The merger could not have occurred without the disclosures required by U.S. securities laws.  Those laws required, *inter alia*, the filing of Form S-4 and the inclusion in that filing of audited financial statements of Old Near and/or Near Holdco.  As part of the process of Old Near's reorganizing and becoming a publicly traded company via a de-SPAC transaction, its financial statements first needed to be audited under PCAOB standards, *i.e.*, GAAP.

23.     As a foreign company, Old Near's financials had been audited under Singapore accounting standards, not those of the Financial Accounting Standards Board.  Accordingly, Old Near's existing financial statements were not compliant with GAAP; nor did they purport to be. With the upcoming de-SPAC transaction, Old Near sought out a U.S. audit firm that would agree to conduct the audit on the timeline contemplated by the negotiations with the SPAC.  UHY agreed to provide those audit services.

24.     From the first discussions between Old Near and UHY in February 2022, UHY at all times knew that Old Near needed financial statements prepared in accordance with GAAP and Regulation S-X of the Securities and Exchange Commission for use in an acquisition by the SPAC. Indeed, emails between UHY and Old Near's CFO in February 2022 alerted UHY that the SPAC (identified in the email as KludeIn) was Old Near's "SPAC sponsor."

25.     UHY's knowledge that the SPAC would be receiving and relying on its audit of Old Near and Near Holdco was also confirmed in UHY's March 12, 2022 "███████████ ███████" (the "<u>Acceptance Memo</u>").  The Acceptance Memo, in which a management team of UHY

recommended ██████████████████████████████ that UHY accept the audit engagement, specifically referenced the SPAC as the acquiring entity on its first page and several other times throughout. The Acceptance Memo also contained a joint presentation by Near Holdco and the SPAC that, among other things, confirmed that the SPAC was based in California. These references were not just passing mentions of the SPAC or the acquisition in general. Rather, on the first page of the ████████████████████████████████████████, UHY personnel specified that ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ :

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

26.      The Acceptance Memo was signed by ██████████████████████

████████████████████████████████████████████████████████████

████████████. In other words, from the outset, UHY always knew that its audit would be used—and relied upon—by the California-based SPAC. That understanding was further confirmed in UHY's March 22, 2022 ████████████████Memo████████████████████████████████

████████████████████████████████████████████████████████████

████████████ and it was referenced again when UHY later consented to the inclusion of its audit report in the SPAC's Form S-4 filing.

27.      Thus, when UHY issued its engagement letter to Near Holdco in March 2022 and undertook to audit the financial statements of Near Holdco and subsidiaries, UHY did so with full knowledge that its audits were intended for the specific benefit of the SPAC and integral to the de-

SPAC transaction.  It is no surprise, then, that UHY expressly consented (on multiple occasions) to the SPAC's including UHY's audit opinions in its securities filings.

**E.      UHY's Relationship to the SPAC**

28.      Although the SPAC was not UHY's client, UHY maintained regular contact with the SPAC throughout its audits of Near Holdco and endeavored to keep the SPAC informed about the status of those audits.  Indeed, Old Near specifically instructed UHY to do so.  As UHY was being retained, UHY's Engagement Quality Review Partner asked Agarwal if he wanted UHY "to cc [the SPAC's co-President] on our communications so he has the same info" UHY was providing to Agarwal.  Agarwal responded, "Yes, we would like the SPAC team to remain involved in the [audit] process . . . .  You can keep [the SPAC's co-President] updated on the status and updates," to which the UHY partner replied, "Understood."  UHY complied with this instruction.

29.      UHY corresponded with the SPAC about the audit and upcoming de-SPAC transaction as it would with a client.  A day after Old Near and UHY signed a memorandum of understanding concerning the scope of UHY's retention, UHY sent a message to Old Near and the SPAC, updating them on the status of UHY's due diligence.  A month later—and less than a week after being formally retained by Near Holdco—UHY forwarded on to the SPAC an email UHY had first sent to client Near Holdco, summarizing "the latest proposed rules and changes from the SEC regarding SPACs and De-SPAC transactions."  In that same email chain, UHY advised that "we will need to navigate these dynamics," and UHY specifically warned the SPAC that these "will have a drastic impact on your space."  When the SPAC responded back to UHY with its own perspective, UHY replied to only the SPAC, "We are in violent agreement . . . .  [Y]ou should not be all that effected [sic] based on the rulemaking timeline."

30.      Communications like these continued throughout UHY's audits of Near Holdco. For example, when the de-SPAC transaction was announced in May 2022, the SPAC's co-

President sent the press release to UHY, thanking them "for your support." UHY responded, "Congrats guys!!!! Awesome news. Let us know next steps. We are standing by." Four days later, the SPAC let UHY know those "next steps."

31.     On May 23, 2022, the SPAC emailed UHY to request Near Holdco's financial statements for the first quarter of 2022 for inclusion in the SPAC's Form S-4 filing. UHY's Engagement Quality Review Partner responded, directing UHY personnel to fulfill the SPAC's request and assuring the SPAC that UHY was "happy to assist." Two days later, when the SPAC reminded UHY to send over Near Holdco's audited financial statements for 2020 and 2021, UHY's Engagement Partner sent them to the SPAC that same day. He added that the SPAC should ask for Word versions of the statements because that format "likely will be needed to include into the [SPAC's] S-4," further evincing UHY's awareness of the SPAC's intended reliance.

32.     A week later, the SPAC asked UHY for help preparing "an accounting acquirer memo" for the SPAC's own auditor. UHY fulfilled that request too, sending the SPAC a form that UHY described as a "good guide" while also warning that it was "written for a unique acquisition situation." That is, UHY's relationship with the SPAC also included actively assisting the SPAC in preparing documents requested by the SPAC's own auditor in connection with the SPAC's acquisition of Near Holdco.

33.     Moreover, UHY's contact and communications with the SPAC were not limited to email exchanges about the de-SPAC transaction. UHY also participated in an untold number of phone calls and Zoom meetings with the SPAC, fulfilling its oft-repeated promise to help the SPAC prepare for the de-SPAC transaction however it could. The SPAC's point of contact was always the UHY Engagement Quality Review Partner for the Near Holdco audits. Indeed, the first

conversation between him and the SPAC's co-President concerning the de-SPAC took place even before Near Holdco had formally retained UHY.

34.     In short, UHY always knew that the SPAC was relying on the accuracy of its work, and UHY and the SPAC remained in constant contact about UHY's work and the SPAC's reliance on that work in the months leading up to the de-SPAC transaction.

**F.     UHY's Audit Failures**

35.     As an auditor, UHY was obligated to plan and perform its audits in accordance with Generally Accepted Auditing Standards ("GAAS"), and to adhere to the ethical requirements of the accounting profession, including the American Institute of Certified Public Accountants (the "AICPA") Code of Professional Conduct, Rule 202, requiring compliance with GAAS.  The AICPA's Auditing Standards Board issues pronouncements, known as Statements on Auditing Standards ("SAS"), that amplify, modify, and interpret the general, fieldwork, and reporting standards that govern the practice.  The SAS have been codified as professional standards that are cited as "AU."  An auditor "has the responsibility to plan and perform the audit to obtain reasonable assurances about which the financial statements are free of material misstatement, whether caused by error or fraud."  AU § 110.02.

36.     An independent auditor must plan and perform his or her work with due professional care.  Due professional care requires the exercise of professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence.  An auditor should use the knowledge, skill, and ability called for by the accounting profession to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.  "Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence.  Since evidence is gathered and evaluated

throughout the audit process, professional skepticism should be exercised throughout the audit process." AU § 230.08, SAS 82. In exercising professional skepticism, an auditor "neither assumes that management is dishonest nor assumes unquestioned honesty" and "should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU § 230.09, SAS 82.

37. AU § 339, "Audit Documentation," provides that information contained in working papers constitutes the principal record of the work that the auditor has performed and the conclusions reached concerning significant matters. Accordingly, the work papers should contain, among other things, sufficient documentation to show that the (1) audit evidence obtained, (2) auditing procedures applied, and (3) testing performed, have provided sufficient competent evidential matter to afford a reasonable basis for an opinion. Likewise, SAS 31, "Evidential Matter," provides that an opinion on financial statements is not warranted without adequate attention to underlying accounting data. This obligation requires more than blind reliance on management, as SAS 1, "Due Professional Care in the Performance of Work," expressly states that an auditor cannot be satisfied with less than persuasive evidence simply because of a belief that management is honest.

38. AU § 240, "Consideration of Fraud in a Financial Statement Audit," guides how risk assessments are to be applied "regarding risks of material misstatement due to fraud." An audit should be executed to root out "an incentive or pressure to commit fraud," the "perceived opportunity to commit fraud," and the "ability to rationalize the fraudulent action." Section 240 also warns that "[m]anagement is often in the best position to perpetrate [and conceal] fraud."

39. AU § 334, "Related Parties," sets forth the requirements for auditing related-party transactions, including the requirement that an auditor "[r]eview accounting records for large,

unusual, or nonrecurring transactions or balances." The procedures identified should provide reasonable assurance that identified related-party transactions do not contain misstatements that, when aggregated with misstatements in other balances or classes of transactions, could be material to the financial statements as a whole. As in examining other material account balances, an auditor needs to consider the audit risk posed by related-party transactions and then design and apply substantive tests to evaluate management's assertions. "The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be." AU § 9334.19.

40.     AU § 316, "Consideration of Fraud in a Financial Statement Audit," establishes an auditor's underlying responsibility to obtain reasonable assurance as to whether the financial statements are free of material misstatement. SAS 99 expands the necessary risk assessment and requires discussion or "brainstorming" among audit personnel regarding the risks of material misstatement due to fraud. SAS 99 cautions that management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively.

41.     UHY failed to follow and comply with many of the foregoing provisions and interpretations and failed to adhere to its own acknowledged obligations as Near Holdco's auditor while knowing that the SPAC would rely on and incorporate its audit work into its securities filings and public disclosures.

42.     In UHY's ▮▮▮▮▮▮▮ Memo" for this initial audit, UHY expressly noted ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[REDACTED]

43.     Despite this supposed preparation, UHY's audit missed 4 instances of round-tripping totaling more than $6.7 million in 2021 alone between Near Holdco's predecessor (*i.e.*, Old Near) and its largest customer, MobileFuse.

44.     UHY also failed to investigate other evidence of related-party transactions.  Indeed, early in its engagement, UHY reviewed and commented on material showing that Old Near's CEO, CFO, and President (*i.e.*, Mathews, Agarwal, and Shukla, respectively) held their respective stakes in Old Near through personal holding companies:  Cecil Capital Pte., Ltd. (Mathews), Oriental Investment Advisors Pte. Ltd. (Agarwal), and Godspeed Investments Pte. Ltd. (Shukla).  Despite being aware of the involvement of these related parties, UHY did nothing to investigate their ties to Old Near, Near Holdco, or MobileFuse.  Had UHY done so, it would have discovered that Old

Near listed these related parties as vendors and paid them as such, and it would have discovered that Near Holdco and MobileFuse were related parties. Yet, UHY was apparently unconcerned.

45.     UHY also agreed to conduct a stub period review of the three months ending March 31, 2022, during which Near Holdco's predecessor and MobileFuse round-tripped another $1.5 million that UHY again failed to identify.

46.     As UHY had expected, the SPAC incorporated UHY's clean audit opinion of Old Near's financials for the years ending 2020 and 2021—complete with UHY's consent to its inclusion—in its Form S-4 filed with the SEC on June 30, 2022. No round-tripping, deficiencies with respect to revenue recognition, or related party transactions involving MobileFuse were noted anywhere in these audit opinions and public disclosures.

47.     UHY extended its initial engagement in July 2022, agreeing to perform reviews of Near Holdco's unaudited quarterly financial information for the six-month periods ending June 30, 2022 and June 30, 2021 and the nine-month periods ended September 30, 2022 and September 30, 2021, in conjunction with its annual audit. The purpose of the reviews included allowing UHY to identify types of potential material misstatements in that interim financial information and to suggest material modifications to that information to conform it with GAAP. As before, UHY failed to identify the round-tripping that occurred during these periods.

48.     Near Holdco reengaged UHY to audit its financial statements for the year ending December 31, 2022. Similar to its initial engagement, UHY issued a ████████████████ (the "Continuance Memo") on November 16, 2022 concerning the requested audit. Again, UHY noted that Near Holdco was ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████   In other words, UHY always knew that its

audit of Near Holdco's financial statements would be used—and relied upon—by the SPAC in

connection with its acquisition of Near Holdco.

49.     As before, UHY prepared an '████████████████' for this next audit.  That

memorandum again specifically noted ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

50.     Nevertheless, UHY's audit failed to identify $4.5 million in round-tripping

transactions in 2022 between Near Holdco and MobileFuse.  Securities filings from that same

period reported that approximately 30% of Near Holdco's annual revenue derived from its

relationship with MobileFuse.  That is, despite UHY's recognition that ████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ UHY failed to notice that Near Holdco

was in an ongoing round-tripping scheme with the customer that accounted for 30% of its revenue.

█████████████████████████████████████████████████████

███████████████████████████████

51.     In another example of UHY's audit failures, UHY missed suspicious activity in the

journal entries it examined.  UHY conducted journal testing because, in its initial risk assessments,

UHY had noted ███████████████████████████████████████ █████████

███████████████████████████  And yet, when UHY examined Near Holdco journal entries for

September 29, 2022, it made nothing of the fact that Near Holdco made two payments to

MobileFuse totaling $2.845 million on the same day that it received $3 million back from

MobileFuse.  This was, of course, just another instance of round-tripping in the years-long ordeal.

52.     UHY also reviewed bank statements containing other round-tripping payments but

failed to detect them.  For example, UHY specifically requested and reviewed Old Near's January

2022 bank statement during its audit.  That bank statement showed that Old Near made a payment

of $1.4 million to MobileFuse on January 26, 2022 and then received a payment from MobileFuse

of $1.5 million two days later, on January 28, 2022.  UHY asked no questions about these (or

other) circular payments.

53.     UHY issued at least the following "clean" audit opinions related to its engagement

by Near Holdco:  (a) a May 10, 2022 audit opinion, regarding the consolidated financials of Old

Near and its subsidiaries for the years ending December 31, 2021 and 2020; (b) an August 31,

2022 audit opinion, regarding the consolidated financials of Near Holdco and its subsidiaries for

the years ending December 31, 2021 and 2020; and (c) a March 6, 2023 audit opinion, regarding

the consolidated financials of Near Holdco and its subsidiaries for the years ending December 31,

2022 and 2021.  In each audit opinion, UHY stated that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company" for the years covered (2020, 2021, and 2022), and "the results of its operations and its cash flows for each of the years . . . [were] in conformity with accounting principles generally accepted in the United States of America."  As detailed above, however, these statements were false.  The round-tripping scheme potentially inflated the total revenue of the Old Near and Near Holdco **by up to 30% for both 2021 and 2022** (with round-tripped MobileFuse revenue accounting for $13.5 million of the total purported $45.3 million revenue in 2021 and $18 million of the total purported $59.7 million in 2022).

54.    Unaware of this round-tripping—and as UHY had expected—the SPAC relied on Near Holdco's audited financial statements and UHY's unqualified audit opinions in at least two ways.  First, the SPAC relied on UHY's audit work by incorporating those audited financial statements and opinions into the Form S-4 and amendments thereto that it filed in 2022 and February 2023 and in other securities filings during this period.  No round-tripping, misstatements with respect to Near Holdco's revenue, or related-party transactions involving MobileFuse were noted anywhere in these public disclosures.

55.    Second, the SPAC relied on UHY's unqualified audit opinions in proceeding to consummate the de-SPAC transaction and pay the equivalent of more than $400 million in common stock as consideration for the de-SPAC transaction.  Had UHY's audit work revealed that Near Holdco's revenues were inflated via a related-party round-tripping scheme with MobileFuse, the SPAC would not have acquired Near Holdco or paid more than $400 million in consideration for Near Holdco.

56.     The SPAC's reliance on UHY's representations occurred solely in California, and at all relevant times, UHY knew and intended that its representations concerning the financial condition of Near Holdco were going to be directed to and relied on in California.  From its creation, the SPAC always maintained its principal—and only—place of business in California. UHY knew that its client, Near Holdco, was a California-based enterprise, that the SPAC was a California-based enterprise seeking to acquire Near Holdco, and that UHY's audit of Near Holdco's financial statements was a precondition to that acquisition.  That is, UHY always knew that its audits of a California-based client (Near Holdco) and its associated representations would be transmitted to California for use by Near Holdco and also relied upon by another California-based company (the SPAC) in its acquisition of that client in California.  UHY thus knew or should have known that any misrepresentations it made in connection with those audits would cause harm to the SPAC in California.

## G.     The Discovery of the Material Weaknesses that UHY Failed to Identify

57.     By October 2023, the SPAC—now renamed as "Near Intelligence, Inc."—had caught what UHY missed—identifying instances of financial mismanagement and potentially fraudulent actions by Near Holdco's management—and initiated an internal investigation.  On October 1, 2023, the SPAC's board of directors placed Mathews and Agarwal on administrative leave and formed a reorganization committee to oversee that investigation.  By October 3, 2023, the SPAC had determined that the previously issued financial statements of Near Holdco that UHY had audited for the years ended 2021 and 2022 could not be relied upon as a result of the actions of Mathews and Agarwal that had occurred while they were affiliated with Near Holdco and Old Near.  The SPAC thus announced that it was withdrawing all previously issued revenue and

adjusted EBITDA guidance because the revenue of Near Holdco and its predecessor, Old Near, may have been overstated.

58.     By November 2023, the SPAC's internal investigation confirmed that all payments received from MobileFuse in 2022 were made on the same day as or soon after a payment from Near Holdco to MobileFuse for the same or similar amounts.  Despite having audited the financial statements for Old Near and Near Holdco—and having received hundreds of thousands of dollars to do so—UHY had failed to recognize the round-tripping scheme that other investigators were able to identify and diagnose in a month's time.

59.     UHY somehow failed to recognize that monies were flowing from Old Near and Near Holdco to MobileFuse on the same day or shortly before the same or similar amounts were flowing from MobileFuse back to Old Near and Near Holdco, despite UHY's audit plan calling for its auditors to test for round-tripping and despite the fact that bank statements UHY reviewed confirmed these nearly simultaneous flows of money.  UHY also failed to identify that Near Holdco and MobileFuse were related parties, which likewise required disclosure and should have triggered closer scrutiny of amounts both paid to and received from MobileFuse.  As a result, the financial statements of Old Near and Near Holdco that UHY audited did not fairly, in all material respects, present the financial position of those entities in 2021 and 2022, causing UHY's representations otherwise to be false.  Accordingly, the public disclosures that the SPAC made with respect to those financial statements were, at all relevant times, materially misleading.

## H.     The Severe Costs of UHY's Misrepresentations

60.     The SPAC's reliance on UHY cost it dearly.  Relying on UHY's unqualified audit opinions, the SPAC valued Near Holdco at $575 million.  Near Holdco, however, was insolvent at the time of the de-SPAC transaction, notwithstanding UHY's misrepresentations.

61.     To acquire Near Holdco, the SPAC issued more than 41 million shares of its common stock to Near Holdco shareholders, at a total market price of more than $400 million. The SPAC's total consideration in the de-SPAC consisted of almost 3 million shares of unrestricted common stock, with a market value at the time of more than $30.5 million, and almost 40 million shares of common stock subject to a six-month lock-up period.  Even if one were to apply a 5% discount to the restricted stock portion, the SPAC's total consideration to acquire Near Holdco still exceeded $400 million.

62.     In exchange, the SPAC received a worthless enterprise.  Near Holdco's insolvency and its being riddled with fraud (that UHY missed) rendered it valueless.  In other words, in reliance on UHY's misrepresentations, the SPAC paid over $400 million for an enterprise worth nothing.  Had UHY conducted proper audits and accurately represented Near Holdco's financial condition, the SPAC never would have acquired Near Holdco or paid 41 million shares of common stock as consideration.  In short, the SPAC's reliance on UHY's misrepresentations proximately caused the SPAC to suffer over $400 million in damages.

## I.     The Preferential Transfer to UHY

63.     On September 21, 2023, the SPAC transferred $206,126.00 to UHY as payment for two UHY invoices (the "Transfer").

64.     The SPAC was insolvent at the time of the Transfer.  The fair value of the SPAC's liabilities exceeded the fair value of its assets.

65.     Further, the Transfer, which reflected payment for services rendered by UHY, was not made in the ordinary course of business.  Historically, payments of UHY invoices had been delayed until necessary to qualify UHY as independent for its next audit.  This payment—well

ahead any necessary consents to be provided by UHY concerning its independence—diverted from this custom and practice.

**J.      The Bankruptcy, UHY's Scheduled Claim, and the Tolling of Limitations**

66.      The SPAC filed its petition for relief under chapter 11 of the Bankruptcy Code on December 8, 2023.  That filing tolled the statutes of limitations for all causes of action formerly belonging to the SPAC—and that now belong to the Litigation Trust—until December 8, 2025, pursuant to 11 U.S.C. §§ 108(a) and 546(a).

67.      The SPAC listed UHY's Scheduled Claim as a nonpriority claim in its *Schedule of Assets and Liabilities for Near Intelligence, Inc. (Case No. 23-11962)* [D.I. 114] in the amount of $138,625.00.

**CAUSES OF ACTION**

**Count 1**
**Negligent Misrepresentation**
**Based on Violations of GAAS**

68.      The Trustee re-alleges the allegations set forth in the above paragraphs.

69.      UHY owed the SPAC a duty to not negligently supply it with false information that it knew the SPAC would rely on.  UHY knew that the SPAC would receive the Near Holdco financial statements that UHY had purportedly audited under GAAS and that the purpose of UHY's audits was so that the SPAC could—and would—rely on those audited financial statements in connection with its acquisition of Near Holdco.  That is, UHY issued the unqualified audit opinions at issue here with the intent to induce the SPAC to act in reliance on them and incorporate them into securities filings and disclosures both before and after its acquisition of Near Holdco and subsidiaries.

70.      When performing an independent audit of Near Holdco's financial statements, UHY was required, and was reasonably expected, to follow the following standards, among others:

a.   Exercise and maintain professional skepticism and an independent stance. AU § 150.02, GAAS Gen. Std. No. 2.

b.   Exercise due professional care in the performance of the audit and the preparation of the audit report.  GAAS Gen. Std. No. 3.

c.   Adequately plan the audit and properly supervise any assistants.  GAAS Std. of Field Work No. 1.

d.   Obtain a sufficient understanding of the entity and its environment, including its internal controls and related parties, to assess the risk of material misstatement of the financial statements, whether due to fraud or error, and to design the nature, timing, and extent of further audit procedures.  GAAS Std. of Field Work No. 2.

e.   Obtain sufficient competent evidence by inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  This includes, but is not limited to, seeking and obtaining reliable information from independent sources, including third parties.  GAAS Std. of Field Work No. 3.

f.   Plan, supervise, and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.  GAAS Std. of Field Work No. 2.

g.   Satisfy Audit Standard SAS No. 99, which encompasses the auditor's responsibility to detect fraud in a financial statement audit by, *inter alia*:

   i.   Gathering information necessary to identify risks of material misstatement due to fraud;

   ii.   Using the information gathered to identify risks that may result in a material misstatement;

   iii.   Evaluating the entity's programs and controls that address the identified risks of material misstatement; and

   iv.   Assessing the risks of material misstatement due to fraud throughout the audit and to evaluate at the completion of the audit whether the accumulated results of auditing procedures and other observations affect the assessment.

h.   Evaluate whether fraud risk factors such as "an incentive or pressure to commit fraud," the "perceived opportunity to commit fraud," and the "ability to rationalize the fraudulent action," are present.  AU § 240.A30.

i.   Exercise the skill and care normally possessed by members of the accounting/auditing profession.

71.     Moreover, UHY's audit plan for the 2021 and 2022 audits warned that ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████  Nonetheless, UHY auditors repeatedly failed to identify a pervasive, multi-year round-tripping scheme between UHY's client and its largest customer that was subsequently identified via the fact that the client's bank statements show that it and the customer were sending each other nearly identical amounts on the same day or soon thereafter.  ████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

72.     For these and the reasons stated above, UHY failed to exercise the skill and care normally possessed by members of the accounting/auditing profession in conducting the audits on which the SPAC justifiably relied.

73.     Instead, UHY issued unqualified opinions that the financial statements of Near Holdco presented its financial condition "fairly, in all materials respects" and "in conformity with accounting principles generally accepted in the United States of America," despite that being a false representation.  That is, UHY violated the auditing standards above and supplied false information while knowing that the SPAC would rely on it, and the SPAC reasonably believed the information supplied by UHY and justifiably relied on that false information to its detriment.

74.     As a direct and proximate result of its reliance on UHY's negligent audits, the SPAC suffered hundreds of millions of dollars in damages that it would not have suffered but for UHY's audit failures.

### Count 2
### Unlawful, Unfair, and/or Fraudulent Business Practices in
### Violation of Cal. Bus. & Prof. Code § 17200

75.     The Trustee re-alleges the allegations set forth in the above paragraphs.

76.     The acts and practices engaged in by UHY, and described herein, constitute unlawful, unfair, and/or unfair business practices, in that (a) UHY acted recklessly in how it performed the audits of Near Holdco, performed the quarterly reviews as part of those audits, and issued unqualified audit opinions for financial statements containing material misstatements, while knowing that its unqualified audit opinions would be relied on by the SPAC in deciding to consummate the de-SPAC transaction and to include those financial statements in the SPAC's public securities filings, including its Form S-4 registration statement, Form 10-K annual statements, and prospectuses, and that the public markets were likely to be deceived by UHY's reckless and defective audits and the public interest harmed thereby, and/or (b) the justification for UHY's conduct is outweighed by the gravity of the consequences to the SPAC and the public at-large, and/or (c) UHY's conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to the SPAC, its creditors, and the public at-large, and/or (d) the conduct of UHY constitutes fraudulent, untrue, or misleading actions in that such conduct has a tendency to deceive the SPAC and the public at-large.

77.     UHY is a California-licensed professional firm, and this adversary proceeding concerns representations that UHY made to a California-based enterprise (the SPAC) and auditing services that UHY rendered to another California-based enterprise (Near Holdco) for use by the SPAC in connection with its acquiring Near Holdco, a transaction that occurred in California.

78.     Under California Business and Professions Code § 17204, the SPAC suffered injury in fact as a result of such unfair conduct.  Following the de-SPAC transaction, and induced by UHY's work to that point, the SPAC paid UHY for work related to Near Holdco's financial statements.  As alleged above, UHY's work was riddled with errors and materially misstated Near Holdco's financial condition to the SPAC and to the public at-large, rendering that work largely valueless.

79.     Pursuant to California Business and Professions Code § 17203, the Trustee is entitled to such orders or judgments as are necessary to prevent UHY's use or employment of practices that constitute unfair competition, including orders or judgments for restitution, injunctive relief, and any other relief the Court deems appropriate.

## **Count 3**
## **Avoidance of Preferential Transfer Under 11 U.S.C. § 547**

80.     The Trustee re-alleges the allegations set forth in the above paragraphs.

81.     On or within 90 days before the Petition Date, the SPAC made the Transfer to UHY.

82.     The Transfer constituted a transfer of an interest in the SPAC's property.

83.     The Transfer was made to or for the benefit of UHY as a creditor of the SPAC.

84.     The Transfer was made for or on account of an antecedent debt owed by the SPAC to UHY prior to the date of the Transfer.

85.     The SPAC was insolvent at the time of the Transfer.

86.     The Transfer enabled UHY to receive more than it would have received if the SPAC's bankruptcy case were a case under chapter 7 of the Bankruptcy Code, the Transfer had not been made, and UHY received payment of the debt related to the Transfer to the extent provided by the provisions of the Bankruptcy Code.

87.     Accordingly, the Trustee seeks to avoid the Transfer under 11 U.S.C. § 547(b).

### Count 4
### Recovery of Preferential Transfer Under 11 U.S.C. § 550

88.     The Trustee re-alleges the allegations set forth in the above paragraphs.

89.     The Transfer is subject to avoidance under 11 U.S.C. § 547(b).

90.     UHY received the Transfer as the initial transferee.

91.     Accordingly, the Trustee seeks to recover the value of the Transfer from UHY under 11 U.S.C. § 550(a)(1).

### Count 5
### Equitable Subordination

92.     The Trustee re-alleges the allegations set forth in the above paragraphs.

93.     The Scheduled Claim lists the SPAC as owing UHY $138,625 for a nonpriority trade claim.

94.     UHY engaged in the inequitable conduct alleged above with respect to the SPAC.

95.     The inequitable conduct of UHY not only injured the SPAC and its creditors, but also conferred unfair advantages or benefits on UHY, including amounts UHY received for issuing unqualified audit opinions of financial statements containing material misstatements.

96.     Equitable subordination of the Scheduled Claim is not inconsistent with the Bankruptcy Code and would redress underlying inequitable conduct that directly harmed the SPAC and its creditors.

97.     Accordingly, the Trustee requests that the Scheduled Claim be equitably subordinated to the claims of all other creditors pursuant to section 510(c) of the Bankruptcy Code.

### Count 6
### Objection to Claim

98.     The Trustee re-alleges the allegations set forth in the above paragraphs.

99.     The Scheduled Claim lists the SPAC as owing UHY $138,625 for a nonpriority trade claim.

100.    The Trustee hereby objects to the Scheduled Claim because: (a) the Scheduled Claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code; (b) the Scheduled Claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against UHY in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law; and (c) the Scheduled Claim should be disallowed under section 502(d) of the Bankruptcy Code.

## **PRAYER**

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against UHY as follows:

a.      awarding compensatory, consequential, and/or monetary damages in an amount to be determined at trial on the Trustee's claims;

b.      awarding restitution and such other equitable relief the Court deems just and proper;

c.      avoiding the Transfer under 11 U.S.C. § 547(b);

d.      directing that the value of the Transfer be paid to the Trustee under 11 U.S.C. § 550(a)(1);

e.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

f.      awarding reasonable attorney's fees and expenses, together with all costs of court, and other expenses incurred in this action;

g.      subordinating or disallowing the Scheduled Claim under 11 U.S.C. §§ 502(b)(1), 502(d) and 510(c); and

h.      granting such other and further relief, at law or equity, as this Court deems just and proper.

Dated: October 30, 2025
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Peter J. Keane*
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (admitted *pro hac vice*)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
T: (302) 652-4100
F: (302) 652-4400
bsandler@pszjlaw.com
blevine@pszjlaw.com
pkeane@pszjlaw.com

**REID COLLINS & TSAI LLP**

Eric D. Madden (admitted *pro hac vice)*
Brandon V. Lewis (admitted *pro hac vice*)
Brian J. Bah (admitted *pro hac vice*)
1601 Elm Street, Suite 4200
Dallas, TX 75201
T: (214) 420-8900
F: (214) 420-8909
emadden@reidcollins.com
blewis@reidcollins.com
bbah@reidcollins.com

*Counsel for the Trustee*