# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JOHN FAIETA**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, John Faieta, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information and belief:

1. I am the Chief Financial Officer of Near Intelligence, Inc. ("Near") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"). As Chief Financial Officer, I am familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtors. I joined Near in April 2021 as Controller and, since October 1, 2023, have served as its Chief Financial Officer.

2. Prior to joining Near, I served as Controller and Chief Financial Officer of UberMedia, Inc. ("UberMedia") from 2011 until it was acquired by Near in April 2021. Prior to joining UberMedia, I served as Controller for eSolar, a developer of concentrated solar power projects around the globe. I hold a B.A. degree in Economics from California State Polytechnic University, Humboldt, and an MBA from Pepperdine Graziadio School of Business and Management. I am also a licensed CPA.

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (7857), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd. The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

Case 23-11962-TMH Doc 141 Filed 12/28/23 Page 23 of 139

3. On December 8, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (collectively, the "Chapter 11 Cases"). To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the Debtors' Petitions and the First Day Pleadings.

4. All facts set forth in the Declaration are based on: (a) my personal knowledge; (b) my communications with members of the Restructuring Committee of Near's Board of Directors (the "Restructuring Committee"), the Debtors' senior management team, and the Debtors' professional advisors; or (c) my opinions developed through my overall professional experience, personal knowledge of the Debtors' history, financial condition, and business operations and affairs.

5. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the matters set forth herein.

## INTRODUCTION

6. The Debtors are a full stack, data intelligence software provider of enriched data on people and places. By using this data, the Debtors' customers can derive actionable intelligence regarding consumer behavior, which in turn enables them to make meaningful business decisions.

Specifically, the Debtors are a leading provider of privacy-safe consumer movement data and generate revenue by compiling raw data from anonymized user identifications and points of interests, and then curating and providing that data to customers through their digital software products. Customers pay a fee to access these digital software products.

7. The Debtors' customers include Fortune 500 companies and small to large enterprises across numerous industries, including the restaurant, tourism, automotive, and retail industries. The Debtors' data and insights empower their customers to understand consumers' online and offline behaviors and to engage consumers in order to grow their businesses. With a presence in Pasadena, Paris, Bangalore, Singapore, Sydney, and Tokyo, the Debtors service their customers on a global scale.

8. Notwithstanding significant business growth in recent years, in the months leading up to the Petition Date, the Debtors faced numerous challenges. These headwinds included, among other things, allegations of financial mismanagement and fraudulent actions taken by Near's former Chief Executive Officer and former Chief Financial Officer, an inability to satisfy certain covenants under the Debtors' secured loan facility with their prepetition first lien lenders—affiliates of Blue Torch Finance LLC ("Blue Torch")—and difficulty raising additional capital. While the Debtors continue to generate revenue, their revenue streams—even when combined with extensive cost cutting measures—will be insufficient to meet the Debtors' long-term liquidity needs and working capital requirements.

9. To help address these challenges, in the months leading up to the Petition Date, the Debtors retained Willkie Farr & Gallagher LLP ("Willkie"), Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), GLC Advisors & Co. ("GLC"), Kroll Restructuring Administration LLC ("Kroll"), and Ernst & Young LLP ("E&Y" and collectively with Willkie, Young Conaway,

31041244.1

GLC, and Kroll, the "Restructuring Advisors") to assist with contingency planning for a potential chapter 11 proceeding, and to conduct an internal investigation into the alleged improprieties against the former Chief Executive Officer and former Chief Financial Officer. The Debtors also engaged with Blue Torch regarding a holistic restructuring transaction to be effectuated through the chapter 11 process, which would include a potential debtor-in-possession financing facility and stalking horse bid for substantially all of the Debtors' assets.

10. To that end, shortly before the Petition Date, the Debtors secured a commitment for a $16 million new money superpriority debtor-in-possession financing facility (the "DIP Facility"), including up to $5 million on an interim basis, to be provided by the DIP Lenders (as defined in the DIP and Cash Collateral Motion) and secured by priming liens on substantially all of the Debtors' assets. The DIP Facility matures 90 days after the Petition Date and is designed to bridge the Debtors to the closing of a sale. In addition, the Debtors have filed a motion on the Petition Date seeking, among other things, approval of sale procedures that provide for BTC Near HoldCo LLC (together with each of its permitted successors, assigns and designees) to serve as a stalking horse bidder pursuant to the terms of that certain Asset Purchase Agreement, dated as of December 8, 2023, attached to the motion as **Exhibit A-4** (the "Stalking Horse APA"), to purchase substantially all of the Debtors' assets, subject to a court-approved overbidding process and bid procedures.

11. Moreover, the DIP Facility and Stalking Horse APA contemplate the following timeline for a sale process pursuant to section 363 of the Bankruptcy Code:

- No later than two (2) business days after the Petition Date, the Debtors are required to file an appropriate motion with the Bankruptcy Court for the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and the bid procedures that establishes a date that is no later than fifty-five (55) calendar days after the Petition Date as the deadline for the submission of binding bids with respect to their assets;

- No later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered an order approving the DIP Facility on an interim basis;
- No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the DIP Facility on a final basis, subject to the availability of the Bankruptcy Court to conduct the final hearing on the DIP Facility;
- No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the bid procedures;
- No later than sixty (60) calendar days after the Petition Date, the Debtors are required to commence an auction for their assets, provided that if there is no higher or better offer submitted in comparison to the Stalking Horse APA, no auction will be held;
- No later than seventy-one (71) calendar days after the Petition Date, the Bankruptcy Court shall have entered a sale order approving the winning bid resulting from the sale process; and
- Consummation of the sale and transactions contemplated thereby shall occur no later than the date that is eighty-five (85) calendar days after the Petition Date.

12. I believe that time is of the essence in consummating a sale of the Debtors' assets. The Debtors' are rapidly burning cash and cannot afford an extended stay in chapter 11. The Debtors vigorously negotiated for the largest postpetition financing commitment and longest maturity possible to afford enough time to market their assets. Absent consummation of a sale on the timeline contemplated by the milestones, I believe that the Debtors' business would be at significant risk of liquidating, which would cost jobs, erode recoveries for creditors, and prevent the Debtors' customers from receiving continued access to the important services that the Debtors supply.

13. In addition to consummating a value-maximizing sale, the Debtors intend to use these Chapter 11 Cases to maximize the value of potential claims and causes of action through a confirmed plan, which will establish a litigation trust, against certain third parties for the benefit of their secured and unsecured creditors (the "Litigation Claims"). These Litigation Claims

include, among other claims, claims arising from damages that the Debtors have suffered as a result of fraudulent conduct by Near's former CEO, former CFO, MobileFuse LLC ("MobileFuse"), and certain other parties. Specifically, leading up to the Petition Date, the Debtors uncovered a carefully concealed scheme that these parties perpetrated against the Debtors through which MobileFuse received tens of millions of dollars in fraudulent transfers and evaded tens of millions of dollars in contractual obligations. As discussed below, the Debtors intend to pursue certain Litigation Claims during the chapter 11 cases, including claims against the former CEO, former CFO, and MobileFuse.

14. Overall, the Debtors' decision to file the Chapter 11 Cases and pursue a sale process is informed by the difficult challenges they face and several months of deliberations by the company's Restructuring Committee, management team, and Restructuring Advisors, and was made only after all alternative options were first considered. Although prevailing headwinds limited the Debtors' options out-of-court, the Debtors' significant efforts prior to the Petition Date provide a clear path to realizing a value-maximizing transaction in chapter 11 for the benefit of all of their stakeholders.

15. To familiarize the Court with the Debtors, their business, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors seek in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;
- **Part II** describes the Debtors' prepetition capital structure;
- **Part III** describes the events leading up to the filing of the Chapter 11 Cases;
- **Part IV** describes the Debtors' proposed debtor-in-possession financing and use of cash collateral; and

- **Part V** provides the factual support for the Petitions and First Day Pleadings.

## I. The Debtors' Corporate History, Structure, and Business Operations

### A. General Background, History, and Key Products

16. The Debtors are a data intelligence company focused on providing their customers with data-driven marketing and operational intelligence offerings through a suite of software-as-a-service products. The Debtors were founded in 2012 by Anil Mathews, the company's former Chief Executive Officer. In 2016, Near launched Allspark, its flagship software-as-a-service product and in April 2021, Near acquired UberMedia—a mobile insights platform that powers advertising, location measurement, and business intelligence. The acquisition of UberMedia greatly expanded the Debtors' operations and nearly doubled their total employee headcount. Today, Near services customers on a global scale, including throughout the United States, Europe, and Asia.

17. The Debtors maintain their headquarters in Pasadena, California, with additional offices and operations throughout Europe and Asia. As a result of the Business Combination (as defined below), Near Intelligence Inc. is a publicly traded company with its shares and warrants listed on the Nasdaq Capital Market (ticker symbol: NIR and NIRWW, respectively).

18. The Debtors' primary software-as-a-service products are AllSpark, a marketing intelligence product and Pinnacle, an operational intelligence product:

- **Allspark**. AllSpark is a marketing intelligence product that enables the Debtors' customers to leverage data-driven marketing intelligence, including the ability to measure the effectiveness of marketing campaigns. Allspark is Near's flagship software-as-a-service product and allows customers to curate audience segments based on real world behavior. Allspark brings data from over 1.6 billion monthly active users and interactions across 70 million places to life in an intuitive and visual product. Put simply, AllSpark automates the entire marketing workflow, which typically consists of three parts:
    - **Audience curation:** Allspark allows users to curate audience segments based on particular rules, and to overlay multi-dimension data. For example, a user could

type in "women who frequently visit a gym in Sydney and also spend on air travel," and AllSpark would surface related live data.

- **Activation:** Once an audience segment is curated, Allspark allows businesses to market directly to that audience through its integrated mobile advertising platform or they can export that audience and take it elsewhere.

- **Measurement:** Users can also gauge changes in behavior in order to measure the success or failure of certain business decisions. For instance, if a customer ran a marketing campaign with the goal of driving people to its store, Allspark can provide the user with metrics on how many people walked into the store as a result of the marketing campaign.

- **Pinnacle**. Pinnacle enables the Debtors' customers to access data that is focused on consumer behavior in and around places, such as restaurants, retail locations, and tourist attractions. Pinnacle provides customers with an intuitive user interface and multiple ways of working with human movement data. Pinnacle's interface offers instant charts and maps that can be used to focus on human movement data in a single location, or to compare multiple visitation patterns across geographies and time periods in numerous different countries. Pinnacle allows the Debtors' customers to leverage consumer behavior data to understand how historical trends affected footfall for themselves and competitors, allowing them to make informed and strategic business decisions.

### B. Corporate Structure

19. The Debtors' current corporate structure is the product of a "SPAC merger," and the business combination (the "Business Combination") contemplated by that certain Agreement and Plan of Merger, dated as of May 18, 2022 (the "Merger Agreement"), by and among KludeIn I Acquisition Corp., a special purpose acquisition company and Delaware corporation ("KludeIn"), Paas Merger Sub 1 Inc., a Delaware corporation and wholly owned subsidiary of KludeIn ("Merger Sub 1"), Paas Merger Sub 2 LLC, a Delaware limited liability company and wholly owned subsidiary of KludeIn ("Merger Sub 2"), and Near Intelligence Holdings Inc., a Delaware corporation ("Near Holdings"). Pursuant to the Merger Agreement, (i) Merger Sub 1 merged with and into Near Holdings, with Near Holdings surviving the merger as a wholly owned subsidiary of KludeIn (the "First Merger"), and (ii) immediately following the First Merger, Near Holdings,

as the surviving entity of the First Merger, merged with and into Merger Sub 2, with Merger Sub 2 being the surviving entity.

20. KludeIn stockholders approved the Business Combination at KludeIn's special meeting held on March 20, 2023 and the Business Combination was completed on March 23, 2023 (the "Closing Date"). On the Closing Date, in connection with the consummation of the Business Combination, KludeIn changed its name from KludeIn I Acquisition Corp. to Near Intelligence, Inc., and Merger Sub 2 changed its name from Merger Sub 2 to Near Intelligence LLC. Beginning on March 24, 2023, Near Intelligence, Inc.'s common stock and warrants started trading on the Nasdaq Capital Market under the ticker symbols "NIR" and "NIRWW," respectively.

21. A summary chart depicting the Debtors' current corporate structure is attached hereto as **Exhibit A** (the "Organizational Chart").

### C. Foreign Operations

22. In addition to the United States, Near and its Debtor and non-Debtor subsidiaries operate throughout Europe and Asia. While Near Intelligence Pte. Ltd. (based in Singapore) is a Debtor in these Chapter 11 Cases, none of the other corporate entities that comprise the Debtors' European and Asian business are chapter 11 Debtors (the "Non-Debtor Foreign Subsidiaries").

## II. The Debtors' Prepetition Capital Structure

### A. Equity Ownership

23. Debtor Near Intelligence, Inc. is a publicly traded company and its shares trade on the Nasdaq Capital Market under the ticker NIR. As of the Petition Date, Near Intelligence, Inc. has approximately 57 million issued and outstanding shares of common stock. As reflected in the Organizational Chart, Debtor Near Intelligence LLC is a wholly owned subsidiary of Near Intelligence, Inc., and Debtors Near North America, Inc. and Near Intelligence Pte. Ltd. are wholly owned subsidiaries of Near Intelligence LLC.

**B. Prepetition Funded Debt Obligations**

24. As of the Petition Date, the Debtors have an aggregate principal amount of approximately $96 million in funded debt principal obligations, consisting of the outstanding principal obligations arising under the Prepetition First Lien Facility, the Convertible Debentures, and the Promissory Notes (each as defined below).

| Type of Debt | Maturity | Principal Amount |
|---|---|---|
| Prepetition First Lien Facility | November 4, 2026 | $76,742,047 |
| Convertible Debentures | Part A Debentures – February 2, 2027<br><br>Part B Debentures – the earlier of (a) February 2, 2027 or (b) the termination or repayment of the term loans issued pursuant to the Prepetition First Lien Facility | $17,096,742 |
| Promissory Notes | December 31, 2023 | $2,516,380 |
| **Total** | | **$96,355,169** |

25. **Prepetition First Lien Facility.** Debtor Near Intelligence LLC (f/k/a Paas Merger Sub 2 LLC and successor in interest to Near Intelligence Holdings Inc.), as borrower, Debtor Near Intelligence, Inc., as parent, Debtors Near North America, Inc. and Near Intelligence Pte. Ltd., as guarantors, the lenders party to the Prepetition First Lien Facility (as defined below) from time to time (the "Prepetition First Lien Lenders"), and Blue Torch Finance LLC, as administrative agent and collateral agent (the "Prepetition First Lien Agent"), are parties to that certain Financing Agreement, dated as of November 4, 2022, providing for the Debtors' first-lien term loan credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Facility").

26. To secure the Prepetition First Lien Facility, the Debtors entered into various security and collateral documents in favor of the Prepetition First Lien Agent (for the benefit of

the Prepetition First Lien Lenders) and various security and collateral documents, pursuant to which the Prepetition First Lien Lenders were granted first priority liens on substantially all of the Debtors' assets (the "Prepetition First Lien Collateral"). The maturity date of the Prepetition First Lien Facility is November 4, 2026. As of the Petition Date, approximately $77 million of principal remains outstanding under the Prepetition First Lien Facility, plus all accrued and outstanding interest (including interest paid in kind, accrued but unpaid interest payable in cash and interest at the default rate, each as applicable), fees (including the Deferred Consent Fee, as defined in the Prepetition First Lien Facility documents), reimbursements, expenses and all other obligations outstanding under the Prepetition First Lien Facility documents as of the Petition Date.

27. **Convertible Debentures.** Debtor Near Intelligence, Inc. issued certain convertible debentures (the "Convertible Debentures") in a series of private placements (i.e., the Part A & Part B Convertible Debentures). The Convertible Debentures are unsecured and subordinate to the Prepetition First Lien Lenders under the Prepetition First Lien Facility. The maturity date of the Part A Convertible Debentures is February 2, 2027, and the maturity date of the Part B Convertible Debenture is the earlier of (a) February 2, 2027 or (b) the termination or repayment of the obligations under the Prepetition First Lien Facility. As of the Petition Date, approximately $17 million of principal, in the aggregate, remains outstanding under the Convertible Debentures.

28. **The Promissory Notes**. In connection with the Business Combination, Debtor Near Intelligence, Inc. (f/k/a KludeIn I Acquisition Corp.) assumed a working capital loan (the "Working Capital Loan") issued by KludeIn Prime LLC (the "Sponsor") to KludeIn I Acquisition Corp. The Working Capital Loan is evidenced by a promissory note. Separately, in connection with the Business Combination, Near Intelligence, Inc. also assumed a promissory note which was issued by

the Sponsor to KludeIn I Acquisition Corp. to finance the Sponsor's transaction costs related to the Business Combination (together with the Working Capital Loan, the "Promissory Notes"). The Promissory Notes are unsecured, bear no interest and are currently due on December 31, 2023. As of the Petition Date, approximately $2.5 million of principal, in the aggregate, remains outstanding under the Promissory Notes.

29. **Other Unsecured Claims.** The Debtors also have numerous other unsecured claims outstanding as of the Petition Date, including vendor claims and litigation claims. The Debtors estimate that such trade claims total approximately $7 million.

## III. Events Leading to the Commencement of these Chapter 11 Cases

### A. Recent Financial Performance and Liquidity Constraints

30. The Debtors have incurred losses each year since their inception in 2012, having suffered a net loss of approximately $100 million for the fiscal year ended December 31, 2022. As revenues have been modest, the Debtors have relied heavily on debt and equity financings to fund operations. Despite the revenues generated from sales of their software products and management's best efforts to stabilize operations, the Debtors' business prospects have significantly declined in recent months. Several factors, among others, have contributed to this decline:

31. ***Industry Competition***. Competition in the data intelligence industry is robust and the market is saturated with competitors who are constantly developing new technologies and products for more efficiently gathering, cataloging, and updating data. The Debtors' inability to maintain the quality of their products in accordance with industry standards has led to difficulties in retaining and obtaining customers, as customers have numerous firms to turn to for their data intelligence needs.

32. ***Regulatory Headwinds***. There have also been significant changes in regulatory and legal environments surrounding data protection and privacy. The recent enactment of stricter data privacy regulations has generally caused headwinds throughout the industry, and it has become increasingly difficult for data intelligence providers to aggregate the accurate consumer and behavior data that they rely on to deliver their software products.

33. ***Difficulty Raising Capital***. The Debtors have also faced difficulty in recent years raising capital in an amount sufficient to meet their liquidity needs and fund operations. As a result, the Debtors have been forced to undertake necessary cost reduction actions, including significant reductions in force. These actions have made it increasingly difficult for the Debtors to maintain their high standards for developing, maintaining, and delivering their software products. These factors (among others) have made it increasingly difficult or the Debtors to maintain and grow their current customer base and realize net positive revenues.

**B. Investigation of Improprieties and Appointment of Restructuring Committee**

34. On October 1, 2023, the Board of Directors of Near appointed the Restructuring Committee to oversee both the Debtors' restructuring efforts and an internal investigation conducted by Willkie, the Debtors' outside counsel, with respect to suspected financial mismanagement and fraudulent actions taken by Near's former Chief Executive Officer (Mr. Mathews) and former Chief Financial Officer (Mr. Agarwal). The Restructuring Committee also authorized and directed the Debtors to place Mr. Mathews, Mr. Agarwal, and several other employees on administrative leave pending the results of its investigation.[2]

[2] Additionally, on October 3, 2023, the Board determined that previously issued financial statements of Near should not be relied upon, including Near's financial statements as of and for each of the years ended December 31, 2022, 2021 and 2020 as well as Near's quarterly financial statements for the periods ended March 31, 2023 and June 30, 2023. The conclusion that the previously issued financial statements should not be relied upon resulted from the Restructuring Committee's assessment that certain revenue may have been overstated.

35. Through the investigation, the Debtors uncovered a carefully concealed scheme that was perpetrated against the Debtors through which MobileFuse received tens of millions of dollars in fraudulent transfers and evaded tens of millions of dollars in contractual obligations. Specifically, since as early as 2020, MobileFuse, Mr. Agarwal, Mr. Mathews, and others deliberately caused Near to pay MobileFuse tens of millions of dollars for phony data services that MobileFuse never delivered under sham contracts that MobileFuse never performed. MobileFuse then used that money—Near's money—to "pay" Near for tens of millions of dollars of services that Near performed under real contracts. As a result of this scheme, MobileFuse owes the Debtors at least $40 million in unpaid fees, and has caused significant additional damage to the Debtors and their stakeholders. The Debtors believe that the motive of this scheme was, among other things, to inflate both Near's and MobileFuse's revenues as well as Mr. Mathews's and Mr. Agarwal's compensation.[3]

36. Based on the investigation results, in November 2023, the Restructuring Committee terminated the employment of Mr. Agarwal and Mr. Mathews for cause, effective immediately, pursuant to the terms of their respective employment agreements. To maximize value for their stakeholders, the Debtors intend to pursue claims against the former CEO, former CFO, and MobileFuse during the chapter 11 cases.

### C. Default Under Prepetition First Lien Facility and Forbearance Agreements

37. In April 2023, the Debtors' liquidity was less than the minimum required under the Prepetition First Lien Facility and, as a result, the Debtors were in breach of applicable covenants under the Prepetition First Lien Agreement and such breaches constituted events of default. On

[3] On November 29, 2023, Mr. Mathews filed a Statement of Claim and arbitration demand against Near Intelligence, Inc. The Statement of Claim asserts several causes of action against Near Intelligence, Inc., including (among others) defamation, intentional and negligent interference with prospective economic relations, and breach of contract.

May 5, 2023 and May 10, 2023, the Debtors entered into forbearance agreements with the Prepetition First Lien Lenders, pursuant to which the Prepetition First Lien Lenders agreed to temporarily forbear from exercising its default-related rights and remedies against the Debtors with respect to the liquidity and other specified events of default.

38. On May 18, 2023, the Debtors entered into that certain Waiver and Amendment No. 3 to the Prepetition First Lien Facility with the Prepetition First Lien Lenders, pursuant to which the Prepetition First Lien Lenders waived certain existing defaults and the parties agreed to amend certain terms of the Prepetition First Lien Facility relating to, among other things, the minimum liquidity requirements. The Prepetition First Lien Facility was subsequently amended on July 18, 2023 and August 31, 2023, when Blue Torch agreed to further waive certain specified defaults under the facility.

39. In addition, on October 8, 2023, the Debtors entered into that certain Amendment No. 6 and Limited Forbearance to the Prepetition First Lien Facility with Blue Torch, pursuant to which Blue Torch agreed to temporarily forbear from exercising its default-related rights and remedies with respect to all existing events of defaults during the specified forbearance period. During the forbearance period, as further discussed below, the Debtors engaged in fruitful discussions with Blue Torch regarding a holistic restructuring transaction to be effectuated through a chapter 11 process.

**D. Efforts to Negotiate a Comprehensive Restructuring**

40. In an attempt to mitigate the adverse economic and operational challenges facing them, in the months leading up to the bankruptcy filing, the Debtors initiated various cost-cutting measures to preserve liquidity. These efforts included: implementing pay cuts, a hiring freeze, a

workforce reduction consisting of approximately 56 employees, and reducing disbursements and expenses.

41. While the Debtors have continued to generate revenues, these revenue streams, even when combined with their extensive cost-cutting measures, have been and will continue to be insufficient to cover the Debtors' ongoing cash requirements.

42. With the concerns discussed above in mind, and with their operating cash running low, the Debtors retained the Restructuring Advisors to pursue various strategic alternatives. The Debtors also engaged with Blue Torch regarding the proposed restructuring transactions discussed below, which include a stalking horse bid for substantially all of the Debtors' assets, a chapter 11 plan, and a debtor-in-possession financing facility.

**E. The Proposed Restructuring Transactions**

**i. The Stalking Horse Asset Purchase Agreement and Sale Process**

43. The Debtors and Blue Torch engaged in a series of negotiations over the course of several weeks to implement a comprehensive restructuring transaction involving the commencement of these Chapter 11 Cases to execute a value-maximizing section 363 sale of their assets free and clear of all claims and interests. The section 363 sale will be followed by a liquidating chapter 11 plan to wind-down the Chapter 11 Cases. The proceeds of the DIP Facility may be used, among other things, to fund wind-down costs.

44. In connection with the proposed section 363 sales process, the Debtors have filed a motion contemporaneously herewith seeking, among other things, approval of sale procedures that provide for BTC Near HoldCo LLC (together with each of its permitted successors, assigns and designees) to serve as a Stalking Horse Bidder, pursuant to the terms of the Stalking Horse APA, for substantially all of their assets, against which higher or otherwise better offers may be sought, providing a clear path to consummate a transaction (the "Bid Procedures Motion"). The stalking

horse bid, as described in greater detail in the Bid Procedures Motion, will set the floor for a competitive bidding process where topping bids could yield additional value that would inure to the benefit of all stakeholders. The Stalking Horse APA contemplates a purchase price for the assets that is valued at $50 million plus certain assumed liabilities, which is in the form of a credit bid consisting of (i) all outstanding obligations under the DIP Facility and (ii) not less than $34 million of the outstanding obligations under the Prepetition First Lien Facility. The Debtors began engaging with interested parties prior to the Petition Date and will market test the stalking horse bid to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for substantially all of the business assets or some or all of their assets.

45. Specifically, in November 2023, the Debtors, GLC, and the other Restructuring Advisors commenced a targeted marketing and sale process for substantially all of the Debtors' assets. In connection with the marketing efforts, GLC contacted over 100 parties that might be interested in pursuing a transaction for the Debtors' assets (including strategic and financial partners). Although this process has not yet yielded a viable proposal for a transaction involving the Debtors' assets, GLC will continue marketing the assets on a postpetition basis pursuant to the bid procedures.

46. If approved, the proposed bid procedures will enable the Debtors to expeditiously sell their assets free and clear of liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, encumbrances, and other interests. Time is of the essence in consummating a value-maximizing sale transaction. While the Debtors negotiated for as much runway as possible, Blue Torch emphasized the need for an expedited process given the Debtors' liquidity profile. Accordingly, the milestones set forth in the DIP Facility, consistent with the timeline set

forth in the proposed bid procedures, contemplate a brief but robust postpetition marketing process and sale.

**ii.** ***The Chapter 11 Plan***

47. On the date hereof, the Debtors filed a combined chapter 11 plan and disclosure statement (the "Plan") that, if confirmed, will allow for both the efficient wind-down of the Debtors' estates following the sale process, and the realization of maximum value with respect to remaining assets for the benefit of their stakeholders. The wind-down efforts will be facilitated by a litigation trust established under the Plan and overseen by a litigation trustee and litigation trust board. The purpose of the litigation trust will include pursuing and liquidating the litigation trust assets, including litigation claims transferred to the trust, reconciling and objecting to claims, winding-down the Debtors' estates, and making distributions to the beneficiaries of the trust.

48. The litigation trust assets will include, among other things, the Debtors' rights to pursue certain causes of action against third parties. The beneficiaries of the trust will include holders of Prepetition Loan Claims and General Unsecured Claims (each as defined in the Plan).

## IV. The Proposed Debtor-in-Possession Financing

49. To provide the Debtors with liquidity to commence a smooth landing into these Chapter 11 Cases and fund a value-maximizing sale process, the Prepetition First Lien Lenders agreed to provide the DIP Facility, as well as access to prepetition cash collateral (the "Cash Collateral"). The DIP Facility and access to Cash Collateral will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during these Chapter 11 Cases, and to run a process to achieve a value-maximizing sale of their assets.

### A. Need for DIP Financing

50. As discussed herein, the Debtors' need for immediate liquidity in the form of the proposed DIP Facility is largely driven by operational challenges. The DIP Facility was carefully

negotiated and will provide cash to administer these Chapter 11 Cases, fund the business, pay vendors in the ordinary course, and ensure that wages, taxes, and other obligations are paid. The DIP Facility is the best available financing under the circumstances. Access to such financing at this time is mission critical for executing on the comprehensive chapter 11 transactions discussed above.

**B. The Debtors' Proposed Use of Cash Collateral**

51. Pursuant to the DIP Motion (as defined below), the Debtors also seek the continued use of the Prepetition First Lien Lenders' cash collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases. Without access to cash collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result. Authorization to use cash collateral through the duration of these Chapter 11 Cases will provide the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key vendors and personnel, continue to provide services to their customers, and pay wages to employees.

52. In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the Prepetition First Lien Lenders with adequate protection as set forth in the DIP Motion and the accompanying proposed orders. The Debtors' use of Cash Collateral will be subject to the same milestones agreed upon in the DIP Facility. In addition, the Debtors have agreed on additional reporting covenants for the benefit of the prepetition agent and DIP agent, including rights to participate in calls with the Debtors' management and cooperation with the Debtors' financial advisors.

Case 25-12376-TMH Doc 41 Filed 12/22/25 Page 21 of 39

## V. Evidence in Support of First Day Pleadings[4]

53. In my capacity as Chief Financial Officer, I believe that the relief requested in the First Day Pleadings is necessary and essential to ensuring that the Debtors' immediate needs are met, and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of these Chapter 11 Cases. My opinion as to the necessity of the First Day Pleadings is based upon my firsthand experience as Chief Financial Officer and my review of various materials and information provided to me by the Debtors' senior management and the Debtors' advisors, as well as discussions had in connection therewith. In considering the necessary first-day relief, the Debtors' senior management, the Debtors' advisors, and I were cognizant of the level of cash on hand and the limitations imposed by the cash collateral/DIP budget and, in light of these limitations, narrowed the relief requested at the outset of these Chapter 11 Cases to only those matters that require urgent relief to preserve value during the pendency of these chapter 11 proceedings.

### A. Motions Related to Case Management

#### i. Debtors' Motion For An Order Authorizing the Joint Administration of The Debtors' Chapter 11 Cases

54. The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors, and given the nature of the Debtors' operations, the treatment of certain contracts and business relationships of a single Debtor may impact the assets and operations of other Debtors. I understand that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications and

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

31041244.1

orders. I understand that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought is solely procedural and is not intended to affect substantive rights. Based on the foregoing, I believe that it would be far more efficient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration.

**ii. Debtors' Motion For Entry of An Order Authorizing The Debtors to (I) File a Consolidated List of Creditors In Lieu of Submitting a Separate Mailing Matrix For Each Debtor, (II) File a Consolidated List of the Debtors Thirty Largest Unsecured Creditors and (III) File Under Seal Certain Portions of The Creditor Matrix and Other Filings Containing Certain Personal Identification Information**

55. The Debtors seek authorization to (i) file a single, consolidated list of creditors (the "Creditor Matrix") in lieu of submitting an individual mailing matrix for each Debtor, (ii) file a single, consolidated list of the Debtors' thirty largest unsecured creditors that are not insiders (the "Consolidated Top 30 Creditor List") in lieu of submitting a separate list of twenty largest creditors for each Debtor, and (iii) file under seal and redact certain personal identification information.

56. The Debtors have identified a large number of entities and individuals to which numerous notices of certain matters in these Chapter 11 Cases must be provided. Segregating the Debtors' records to a specific creditor matrix format would be an unnecessarily burdensome task and, because certain of the creditors are or may be creditors of more than one Debtor, failure to maintain a single, consolidated Creditor Matrix would result in duplicate mailings.

57. I also believe that permitting the Debtors to file a Consolidated Top 30 List is necessary for the efficient and orderly administration of these Chapter 11 Cases, and will help alleviate administrative burdens, costs and the possibility of duplicative service because the exercise of compiling separate lists for each individual Debtor would unnecessarily consume the Debtors' and their advisors' limited time and resources.

58. I also believe the Court should authorize the Debtors to redact personal identification information of individuals from filings in these Chapter 11 Cases, including the Debtors' customers, equity holders and employees, because, among other reasons, such information could be used to perpetrate identity theft, stalking, or could cause the Debtors to incur liability under the General Data Protection Regulation, exposing the Debtors to severe monetary penalties. With potentially hundreds of individual creditors, the Debtors cannot reasonably know with sufficient certainty whether a release of such individual creditors' and interest holders' personal information could potentially jeopardize their safety.

**iii. Debtors' Motion For Entry of Order (I) Restating and Enforcing Protections of 11 U.S.C. §§ 362, 365, 525, and 541(c), (II) Approving Notice Related to Non-Debtor Affiliates, and (III) Granting Related Relief**

59. To aid in the administration of the Chapter 11 Cases, the Debtors are seeking an order that confirms the application of four key protections provided by the Bankruptcy Code which I understand to be: (a) the automatic stay provisions of section 362; (b) the *ipso facto* provisions of section 365; (c) the anti-discrimination provisions of section 525; and (d) the provisions of section 541 of the Bankruptcy Code regarding property of the estate. Because of the global nature of the Debtors' business and their dealings with non-U.S. creditors, who may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code, the Debtors are requesting an order implementing these protections be entered by this Court.

60. The Debtors operate in numerous countries across the world with different legal systems, including Singapore, India, France, New Zealand, and Australia. Many of these non-U.S. creditors affected by sections 362, 365, 525, and 541(c) of the Bankruptcy Code are likely not aware of the significant and necessary protections these sections provide to the Debtors. Further, the "automatic" and self-executing nature of these protections may not be recognized promptly by

foreign creditors or tribunals unless embodied in an order of this Court. Accordingly, the Debtors respectfully request that the Court enter an order that restates the applicable provisions of sections of the Bankruptcy Code. Such an order, which the Debtors will be able to transmit to affected parties, will maximize the protections afforded by such sections of the Bankruptcy Code.

61. In addition, to alleviate the confusion that likely will arise concerning certain of the foreign non-Debtor affiliates, the Debtors seek approval from this Court of a notice to the customers, suppliers, and other stakeholders confirming that (i) only one foreign affiliate, Near Intelligence Pte. Ltd., is a debtor in these Chapter 11 Cases, and (ii) the remaining non-Debtor foreign affiliates are not included in these Chapter 11 Cases and are not subject to (a) the supervision of this Court or (b) the provisions of the Bankruptcy Code. Accordingly, the Debtors respectfully request that this Court enter an order approving the form of notice attached to the motion.

62. Absent the relief requested, I believe the Debtors' ability to operate seamlessly in multiple jurisdictions may be impaired to the detriment of their estates, creditors, and all parties in interest. For at least the foregoing reasons, I believe that the relief is in the best interests of the Debtors, their estates, and creditors and should be approved.

**iv. Debtors' Motion For Interim and Final Orders Establishing Notice and Hearing Procedures For Trading in, or Certain Claims of Worthlessness With Respect to, Equity Securities in Debtor Near Intelligence, Inc. (the "NOL Motion")**

63. Through the NOL Motion, the Debtors seek to establish procedures to protect the potential value of the Debtors' federal tax net operating loss carryforwards ("NOLs" and, together with certain other tax attributes, the "Tax Attributes") for use during the pendency of the Chapter 11 Cases. These procedures will apply to (a) common stock (the "Common Stock") of Near Intelligence, Inc., and options, warrants, or similar rights (within the meaning of applicable

31041244.1

treasury regulations) to acquire Common Stock and (b) any claim (for income tax reporting purposes) of a worthless stock deduction under section 165(g) of the Internal Revenue Code of 1986, as amended with respect to Common Stock (a "Worthless Stock Deduction") by a majority shareholder.

64. The NOL Motion seeks authority to restrict trading of Common Stock and any claim of a Worthless Stock Deduction that could result in an ownership change occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order. Such a restriction would protect the Debtors' ability to preserve the Tax Attributes during the pendency of these Chapter 11 Cases. The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

65. I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their business in chapter 11.

**v. Debtors' Application For Entry of an Order Appointing Kroll Restructuring Administration LLC as Claims and Noticing Agent**

66. The Debtors filed an application to retain Kroll Restructuring Administration LLC ("Kroll") as their Court's claims and noticing agent for these Chapter 11 Cases. I believe that the retention of Kroll is critical because of the large number of creditors identified in these cases.

67. I understand that Kroll is a data-processing firm with extensive experience in noticing, claims processing, and other administrative tasks in Chapter 11 cases. I understand that, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. §156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtors obtained and reviewed engagement proposals from at least two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process. I believe that Kroll's rates

are competitive and reasonable given Kroll's quality of services and expertise. Given the need for the services described above and Kroll's expertise in providing such services, I believe that retaining Kroll will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their Chapter 11 efforts.

68. The Debtors also intend to file a separate application to retain Kroll as administrative agent to provide, among other things, certain solicitation-related services.

**B. Motions Related to Operations**

**i. Debtors' Motion For Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Maintain Their Cash Management System, Including Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Honor Certain Prepetition Obligations Related Thereto, (II) Waiving Certain Operating Guidelines, (III) Extending the Time to Comply with Section 345(b) of the Bankruptcy Code, and (IV) Granting Related Relief**

69. In the ordinary course of their business prior to the Petition Date, as is typical with businesses of similar size and scope, the Debtors maintain a centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately. To support their operations, the Debtors maintain a total of nineteen bank accounts at four different banks: HSBC Bank USA, N.A., HSBC Bank (Singapore) Limited, AvidBank, and Citibank Singapore Limited (each, a "Bank," and collectively, the "Banks"). Specifically relating to the Debtors, the Debtors' maintain four collection accounts and fifteen operating accounts with the Banks. The Non-Debtor Foreign Affiliates also maintain collection and operating accounts with certain banks, including BNP Paribas, HSBC Bank (French and Australian Branches), Citibank (Indian Branch), and ICICI Bank. Additionally, the Debtors provide certain employees with access to company credit cards under a corporate credit card program to cover certain payments for necessary and approved company expenditures.

31041244.1

70. Moreover, in the ordinary course of business, the Debtors engage in routine intercompany transactions among themselves and with their non-debtor foreign affiliates (the "Intercompany Transactions") related to, among other things, intercompany funding and loans, which may result in intercompany receivables and payables owing between the Debtors and the Debtors and their Non-Debtor Foreign Affiliates. These Intercompany Transactions are essential to the Debtors' foreign business operations and are consistent with past practices by and amongst the Debtors and their Non-Debtor Foreign Affiliates. The Cash Management System enables the Debtors to pay their financial obligations, centrally control and monitor corporate funds and available cash, reduce administrative overhead expenses, and record accurate financial data.

71. It is my understanding that the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts (which must be designated debtor in possession bank accounts) and obtain, establish, and maintain separate debtor in possession accounts. I also understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment, and reporting requirements.

72. The Debtors are requesting authorization to maintain their existing Cash Management System. I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' business. Any material interruption in the Debtors' existing Cash Management System could cause immediate and irreparable harm, confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could potentially negatively impact creditor recoveries in these Chapter 11 Cases. Moreover, it is my understanding that the majority of the Debtors' Banks are authorized

depositories under the U.S. Trustee Guidelines, while the remaining Banks at which the Debtors maintain accounts are insured by the Federal Deposit Insurance Corporation or applicable foreign government.

73. It is also my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to utilize new checks bearing the designation "Debtor in Possession" and the case number for the debtor in possession accounts. The Debtors request authority to continue using their existing business forms without interference to their status as debtors in possession until such forms are depleted, after which the Debtors intend to begin stamping or printing their business forms with "Debtor in Possession" and the chapter 11 case numbers under which these cases are being administered.

74. Finally, the Debtors also seek authority to continue performing, in their discretion, under the Intercompany Transactions, including with respect to transactions involving the Non-Debtor Foreign Affiliates, and to grant administrative expense status to obligations arising out of intercompany claims consistent and in accordance with historical practice. The Debtors' businesses are operationally and functionally linked to those of their Non-Debtor Foreign Affiliates. These Intercompany Transactions promote efficiency and ensure that the Debtors and their non-Debtor subsidiaries operate in an orderly fashion.

75. I believe that allowing the Debtors to maintain their Cash Management System, continue Intercompany Transactions, continue to use their customary business forms and modify certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines would be in the best interests of the Debtors' estates, creditors, and other parties in interest.

**ii. Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief**

76. In the ordinary course of their business, the Debtors engage in a number of practices to develop, support, and sustain a positive reputation with their customers and in the marketplace generally (collectively, the "Customer Programs"). The Customer Programs include, but are not limited to the Rebate Programs and Credit Programs.

77. To effectuate a smooth transition into chapter 11, the Debtors must maintain customer loyalty and goodwill by continuing to honor their obligations under the Customer Programs. The Debtors have implemented each of the Customer Programs in the ordinary course of business as a means to maintain positive, productive, and profitable relationships with their customers, which is required to remain competitive. I believe that the failure to maintain the Customer Programs would cause immediate and irreparable harm to the Debtors, as such failure would likely cause the Debtors to lose customers, which in turn would prevent the Debtors from maximizing their going concern value through the sale process.

78. The Debtors seek authority to continue the Customer Programs in the ordinary course of business and to honor obligations arising out of the Customer Programs, regardless of when they arose, to avoid any harm or disruption to their business. I believe that the continuation of the Customer Programs is necessary to preserve the Debtors' critical customer relationships and is in the best interests of the Debtors and their estates.

### iii. Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief (the "Wage Motion")

79. The Debtors have filed a motion seeking authority to, among other things, (a) pay all prepetition wages, salaries and compensation to employees and independent contractors, incentive payments and payments owed under historical severance practices, and all related administrative and incidental costs (collectively, the "Compensation Obligations") and prepetition employee benefits (collectively, the "Employee Benefit Obligations"); (b) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "Payroll Taxes"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, garnishments and voluntary deductions (collectively with the Payroll Taxes, the Compensation Obligations and Employee Benefit Obligations, the "Prepetition Workforce Obligations"); and (c) honor and continue the Debtors' prepetition programs, policies and practices as described herein and in the motion in the ordinary course of business.

80. Moreover, as is customary with businesses of similar size, the Debtors have established various employee benefit plans, programs, and policies, including: (a) medical, dental, and vision insurance; (b) paid sick days, vacation days, pregnancy and parental leave, and other paid time off; (c) a 401(k) retirement plan; (c) expense reimbursement; (d) life and accidental death & dismemberment insurance, short-term and long-term disability insurance, and certain benefits to certain former Employees after their termination, retirement, or disability leave, including, but not limited to, benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985; and (e) certain state specific benefits, including voluntary benefits available for opt-in at the

Case 25-12396-TMH Doc 11 Filed 12/08/25 Page 30 of 38

discretion of the Employees. The Debtors seek authority to pay prepetition obligations relating to these policies, and to continue these policies postpetition.

81. Moreover, in the ordinary course of business, the Debtors maintain several incentive and bonus programs (the "Commission Program") to drive performance and retention among their non-insider Employees, including a commission compensation plan for the Debtors' sales teams. Additionally, the Debtors have historically maintained a bonus program for non-insider full-time employees (the "Bonus Program"), which is calculated as a percentage of the Employees' salary, and dependent upon the Employees' performance as well as the Debtors' performance and ultimate revenue for the given year. The Debtors seek authority to continue the Commission Program and Bonus Program in the ordinary course of business and pay any prepetition amounts owed to the Employees in connection therewith.

82. Prior to the Petition Date, the Debtors implemented a retention bonus program for 7 key non-insider in order to ensure a smooth transition into the Chapter 11 Cases (the "Non-Insider Retention Bonus Program"). I believe that none of the employees under the Non-Insider Retention Bonus Program are "insiders" as that term is defined in 101(31) of the Bankruptcy Code. The Debtors seek authority to make any outstanding Non-Insider Retention Program obligations as they come due in the ordinary course.

83. The requested authority to continue to pay their Prepetition Workforce Obligations and to maintain their current employee benefits programs is critical to ensure that the Debtors can retain personnel knowledgeable about the Debtors' business, the Debtors' employees continue to provide quality services to the Debtors at a time when they are needed most, and the Debtors remain competitive with comparable employers.

84. The proposed interim and final orders, if entered, will grant the Debtors the authority to pay the Prepetition Workforce Obligations in accordance with the Debtors' prepetition practices; provided, however, that no single employee shall be entitled to receive more than $15,150 on account of prepetition employee obligations, except to the extent required under applicable state law.

85. If this motion were not granted, I believe that it would result in significant deterioration in morale among employees, which undoubtedly would have a devastating impact on the Debtors. The Debtors' ability to run their business productively depends entirely on the expertise and continued support and service of their workforce. Due to the disruption and uncertainty that typically accompany a chapter 11 filing, I believe that the continuity and competence of their workforce would be jeopardized if the relief requested herein is not granted.

86. I believe that the authority to pay the Prepetition Workforce Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates.

**iv. Debtors' Motion For Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Resolving Objections By Utility Companies and Determining Any Additional Adequate Assurance of Payment, and (IV) Granting Related Relief**

87. In connection with the operation of their business and the management of their headquarters, the Debtors obtain utility services (collectively, the "Utility Services") from various utility companies (collectively, the "Utility Companies"). Pursuant to certain of the Debtors' lease agreements, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments. The Debtors are not seek relief as to such leases. Among other things, the Debtors request that the Court: (a) prohibit the Utility Companies

from altering, refusing, or discontinuing the Utility Services on account of non-payment for prepetition services, including the making of demands for security deposits or accelerated payment terms; (b) determine that the Debtors have provided each of the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on the Debtors' establishment of a segregated account in the amount of $1,145.00, which equals 50% of the Debtors' estimated monthly cost of the Utility Services subsequent to the Petition Date; and (c) establish procedures for determining additional adequate assurance of future payment, if any, and authorizing the Debtors (in consultation with the DIP Agent) to provide additional adequate assurance of future payment to the Utility Companies.

88. Uninterrupted Utility Services are essential to the Debtors' business operations and the overall success of these Chapter 11 Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, causing immediate and irreparable harm. Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

**v. Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief**

89. In the ordinary course of business, the Debtors incur or collect and remit certain taxes, including income, franchise, property taxes, and various other similar taxes, fees, charges, and assessments (the "Taxes and Fees"). The Debtors remit such Taxes and Fees to various foreign, federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies (the "Taxing Authorities"). Payment of the Taxes and

Fees is critical to the Debtors' continued, uninterrupted operations. Further, the Debtors' failure to pay the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors.

90. Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the motion. I believe that payment of the Taxes and Fees in an amount not to exceed $15,000 upon entry of the Interim Order and $70,000 upon entry of the Final Order is in the best interests of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

**vi. Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Insurance Policies and Pay All Obligations in Respect Thereof, (II) Authorizing the Debtors Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related Thereto, and (III) Granting Related Relief**

91. In the ordinary course of business, the Debtors maintain various Insurance Policies administered by third-party Insurance Carriers. The Insurance Policies provide coverage for, among other things: commercial general liability, directors' and officers' liability (including tail coverage), and cyber liability.

92. The Insurance Policies are essential to the ongoing operation of the Debtors' businesses. The annual premiums for the Insurance Policies total approximately $1,700,000 in the aggregate. The Debtors pay all premiums on an annual basis. The Debtors seek authority to honor any prepetition obligations owing on account of the Insurance Policies in the ordinary course of business as they become due to ensure uninterrupted coverage thereunder.

93. In the ordinary course of business, the Debtors also maintain a Premium Financing Agreement in connection with certain Insurance Policies. The Debtors have made eight (8) out of eleven (11) payments on account of the Premium Financing Agreement, with the next installment due on December 23, 2023. The Debtors, out of an abundance of caution, seek authority to honor any related prepetition obligations thereunder and enter into new premium financing agreements, as applicable, in the ordinary course of business.

94. The Debtors also obtain certain of their Insurance Policies through a Broker. The Broker, among other things: (a) manages renewal data; (b) assists the Debtors with the procurement and negotiation of the Insurance Policies; (c) markets the Insurance Policies; (d) enables the Debtors to obtain such policies on advantageous terms at competitive rates under the Premium Financing Agreement; and (e) provides ongoing support throughout the applicable policy periods. The Debtors do not pay the Broker directly for its services. Instead, in accordance with the relevant insurance policy, the Broker may receive surplus lines brokers fees directly from the Insurance Carriers.

95. The Debtors' ability to maintain the Insurance Policies and renew, supplement, and modify the same as needed in the ordinary course of business is essential to preserving the value of the Debtors' businesses, operations, and assets. Moreover, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its Chapter 11 Case. Accordingly, the Debtors seek authorization to maintain the Insurance Policies, pay related prepetition obligations, renew, supplement, or modify the Insurance Policies as needed, and enter into new insurance policies in the ordinary course of business. I believe the relief requested in the Insurance Motion is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest, will avoid immediate and irreparable harm, and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**C. Motions Related to Financing Process**

**i. Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing The Debtors To Obtain Postpetition Senior Secured Financing and The Use of Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief**

96. Concurrently herewith, the Debtors filed a motion seeking authority to enter into a debtor-in-possession financing arrangement (the "DIP Facility") with the DIP Secured Parties. The DIP Facility would provide the Debtors with total financing of up to $16 million in new money term loans, of which $5 million shall be made available on an interim basis upon entry of the Interim Order, and of which $11 million shall be made available on a final basis upon entry of the Final Order, in each case in accordance with the Approved Budget.

97. As explained in greater detail in the motion and supporting declaration, the Debtors are facing a liquidity crisis and are in immediate need of financing to continue their operations. Access to the DIP Facility, coupled with the Debtors' continued use of cash collateral, will provide the necessary liquidity to fund the sale process and the Debtors' operating, working capital and other needs during these Chapter 11 Cases.

98. I believe that access to the funds available under the DIP Facility are crucial to avoid immediate and irreparable harm to the Debtors' estates. Moreover, I also believe that the terms of the DIP Facility are reasonable as they include favorable pricing, reasonable adequate protection measures for the prepetition secured creditors' interests and reasonable fees. I also believe that the terms of the DIP Facility were negotiated at arms' length and in good faith.

99. For the foregoing reasons, I believe that the DIP Facility and the Debtors' use of cash collateral embodies the best available financing under these circumstances and that entry into the DIP Facility, coupled with consensual use of cash collateral, is in the best interests of the Debtors and their estates.

* * *

100. I have reviewed each of the First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) as applicable, is necessary to avoid immediate and irreparable harm; (ii) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations; and (iii) is in the best interests of the Debtors and their stakeholders.

## CONCLUSION

101. For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, along with such other and further relief as the Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed: December 8, 2023

*/s/ John Faieta*
John Faieta
Chief Financial Officer

**EXHIBIT A**

**Organizational Chart**


Near Intelligence, Inc. (USA)
Near Intelligence LLC (USA) – 100%
Near Intelligence Pte. Ltd. (SG) -100%
Near North America, Inc. (USA) – 100%
Near Intelligence SAS (France) – 100%
Near Intelligence Pvt. Ltd. (India) – 100%
Near Intelligence Pty. Ltd. (Australia) – 100%
KEY
Debtor and Borrower
Debtor and Guarantor
Non- Debtor Entities